ILLINOIS CENTRAL RAILROAD Co. *v.* DANIEL TURNER.

1. RAILROADS. *Personal injury. Negligence. Code* 1892, § 1808. *Question for jury.*

In an action against a railroad company for personal injuries, the statutory presumption of negligence applying, if the evidence does not clearly exculpate the defendant, and the testimony as to contributory negligence is conflicting, the case is for the jury, and it is proper to refuse a peremptory instruction for defendant.

2. SAME. *Negligence. Question of fact. Case.*

In an action against a railroad company for personal injuries, it appeared that a switch-engine, pushing two cars at a rate of speed of twenty miles an hour, and without any signals or lookout, at a point in a populous town where the public was accustomed to walk, ran over plaintiff while carrying away his purchases from a trading car which, according to custom, defendant had placed at that point. The evidence did not clearly exculpate the company, the burden by statute being on it; nor did it appear beyond question that plaintiff was guilty of contributory negligence. *Held,* a peremptory instruction for defendant was properly refused.

FROM the circuit court of the first district of Yalobusha county.

HON. EUGENE JOHNSON, Judge.

Action by Daniel Turner against the Illinois Central Railroad Co. to recover for personal injuries.   Plaintiff had judgment for $1,500.   Motion for new trial overruled.   Defendant appeals.

*Mayes & Harris*, for appellant,

Filed a brief discussing the evidence and contending that the case, as to contributory negligence of plaintiff, is controlled by *Railroad Co.* v. *Jobe*, 69 Miss., 452; *Crawley* v. *Railroad Co.*, 70 *Ib.*, 340; *Shands* v. *Railroad Co.*, MS. Op.

*W. S. Chapman* and *P. C. Chapman*, for appellee.

The question of the negligence of the railroad company, and that of the contributory negligence of the plaintiff, were properly left to the jury.   See *Railroad Co.* v. *McGowan*, 62 Miss., 682; *Fulmer* v. *Railroad Co.*, 68 *Ib.*, 355; *Railroad Co.* v. *Summers*, *Ib.*, 566; *Railway Co.* v. *French*, 69 *Ib.*, 121.

*R. F. Kimmons*, on the same side,

Filed a brief devoted exclusively to the discussion of the evidence, contending that the defendant was guilty of negligence, while the plaintiff was free from contributory negligence.

Argued orally by *Edward Mayes*, for appellant, and *W. S. Chapman*, for appellee.

WOODS, J., delivered the opinion of the court.

We shall consider only that assignment of error pressed upon our attention by counsel for appellant in oral argument and in their brief, viz., the refusal of the court below to charge peremptorily for appellant.   The rule authorizing and requiring such charge has been so repeatedly and so fully stated by us in recent cases that we find it unnecessary to attempt its announcement afresh, and we proceed at once to consider the material points in the evidence developed on the trial below.

In the town of Water Valley, where the injuries complained of by the appellee were received, there are four parallel tracks of the appellant's railway. The one lying farthest west and near the depot is known as the house track; the one next is the main line track; the third is called caboose track, while the fourth and most easterly is styled the office track. Cemetery street, one of the most frequented thoroughfares in the town, crosses these four tracks at a right-angle just north of the depot. The caboose track connects with the main track by a switch, at a distance variously stated to be thirty-five, forty and fifty yards south of Cemetery street, and, extending beyond the main track, connects caboose track with house track also. Beyond these switch junctions, the tracks swerve in a considerable curve to the east, so that the view of main track would be wholly cut off by a train on caboose track whose end lay on the switch connecting the two tracks. In other words, a person on the main line looking southward down the track, would see only from thirty-five to fifty yards if the tail of a train on caboose track lay on the switch across the main track. At the point where the injury occurred, the surface of the ground was level, and the public was accustomed to walk over it generally. The injury was inflicted by the movement of a switch-engine used to move cars in the yards of the railway company and in the making up of trains. The engine ran, day and night, over all the tracks, as occasion required, and was accustomed to ring its bell or blow its whistle in running over Cemetery street crossing, the belief prevailing that the statute so required. The switch-engine was pushing two cars in front of it, one a flat and the other a box, and neither the engineer nor fireman could see a person on the track in front of them, unless at some distance. Turner, the appellee, was employed by the agent of Sproat's ice-car, which seems to have been, in part, at least, what counsel for appellant denominates a traveling green-grocery. This car was the property of Sproat, and was hauled from place to place

as part of appellant's local freight-train. At Water Valley, when this train was going north, the custom of four years' standing was, not to stop Sproat's car at his ice-house (as was the custom when the train was going south) or at the station-house, but Sproat's employes met and unloaded their car, so far as needed or practicable, at any point where it chanced to be, whether stationary or moving slowly. This was the established custom of the parties, as clearly appears. On the occasion in question, the appellee had met the train and car first at the ice-house, and had unloaded some cabbages at that place. The train then starting north, appellee followed it to Cemetery street crossing, and there received an armful of cabbages from the car, carried them across main track and house track, and deposited them in Main street, near his wagon; went back across the tracks for another load, and again filled his arms with cabbages, turned and walked about six or eight feet to the main line, and, just as he stepped on it, was struck, knocked down and run over by the train being moved by the switch-engine.

The rate of speed of the switch-engine at the time is put by the witnesses for the appellee at fifteen or twenty miles an hour; and by the testimony of these witnesses the switch-engine and its train ran seventy-five or eighty yards before stopping, after having run over the appellee, as would have been expected if the rate of speed was as described. From the same sources of evidence, it appears that no signal or warning was given by this rapidly-moving train, and no lookout was kept on the cars so being pushed in front of the switch-engine to give an alarm, if necessary, to protect those who habitually used the grounds for crossing and recrossing the tracks at the place where appellee was hurt. That the engineer of the switch-engine was aimlessly running his train at that time is admitted, for he says he saw that the local freight, a long train, as he and his fireman both state, was slowly moving towards—perhaps was partially on—the main line, beginning to make its way north from Water

Valley, and that he could not continue his run on the main line more than about one hundred yards north of the spot where appellee was knocked down until such time as this local freight had proceeded on its route and opened the main line to him. The appellee's evidence shows that when he returned from the place of deposit of his armful of cabbages on Main street to the Sproat car, at Cemetery street crossing, he did look and listen, but neither saw nor heard any thing; but he could only see to the intersection of main track by caboose switch, because the tail of the local freight, of which Sproat's car formed a part, lay on and across the switch over main track, whereby his vision was cut off from the track south of that point. Appellee also says: "It seems like I looked when I started back with the armful of cabbages, when I was struck. . . . . . I think I looked up and down the track when I went across." The appellee says, further: "The switch-engine gave me no warning. If it had, I would have stopped."

On all this evidence, it cannot be affirmed that appellant so perfectly vindicated the conduct of its servants as to make it clear that it was free from negligence, and so leave no place for a reference to the jury for its finding. It seems equally clear that the contributory negligence of appellee was an open question, and properly referable, on the facts admitted and disputed, to the determination of a jury. This course was wisely adopted by the court below, and the jury has found the controversy adversely to appellants, and correctly so, as we think.

*Affirmed.*